**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GREGORY DICKENS,
　　　　*Petitioner-Appellant,*

　　　　v.

CHARLES RYAN,
　　　　*Respondent-Appellee.*

No. 08-99017

D.C. No.
CV-01-757-PHX-
NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
February 10, 2011—Pasadena, California

Filed August 3, 2012

Before: Stephen Reinhardt, Johnnie B. Rawlinson, and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith;
Dissent by Judge Reinhardt

8599

## COUNSEL

Jon M. Sands, Federal Public Defender, Phoenix, Arizona, for petitioner-appellant Gregory Dickens.

John Pressley Todd, Assistant Attorney General, Capital Litigation Section, Phoenix, Arizona, for respondent-appellee Dora B. Schriro.

## OPINION

N.R. SMITH, Circuit Judge:

Gregory Scott Dickens, an Arizona state prisoner, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. Dickens was sentenced to death on each of two counts of felony murder for the 1991 killings of Bryan and Laura Bernstein. In this petition, Dickens challenges his capital sentences, arguing that (1) the Arizona Supreme Court's application of *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), was unreasonable; (2)

the Arizona Supreme Court based its decision on an unreasonable determination of the facts; and (3) his trial counsel rendered ineffective assistance by failing to investigate and present certain mitigating evidence during sentencing.[1]

Regarding Dickens's first two arguments, we must affirm, because (1) the Arizona Supreme Court's application of *Enmund* and *Tison* to the facts of this case was not objectively unreasonable and (2) the Arizona Supreme Court did not base its decision on a clearly erroneous determination of the facts. As for Dickens's third argument, although we agree that Dickens defaulted on his ineffective assistance of counsel claim by failing to fairly present the claim to the Arizona courts, we vacate and remand to allow the district court to reassess whether Dickens has established cause and prejudice for the procedural default under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

## Background[2]

In January 1990, while working as a counselor at the Oak Grove Institute in Temecula, California, Dickens became acquainted with then fourteen-year-old Travis Amaral. Amaral lived at Oak Grove, which is a placement center for violent juveniles. Dickens worked with Amaral and learned that he was a "high risk" patient with a "violent and explosive temper." Dickens also learned that Amaral battered a nurse and frequently bragged about carrying guns and being involved in several murders. Dickens quit working at Oak Grove in March 1990 but maintained his friendship with Amaral.

---

[1]Dickens raises other uncertified issues on appeal, which we address in a separate Memorandum Disposition filled concurrently with this Opinion.

[2]These facts are drawn substantially from the Arizona Supreme Court's opinion in *State v. Dickens*, 926 P.2d 468, 474-75 (Ariz. 1996) (in banc). We presume the correctness of the Arizona court's findings unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In early September 1991, a few days after Dickens moved to Yuma, Arizona, Amaral contacted Dickens and explained that he was running away from home. Hearing this news, Dickens purchased a bus ticket for Amaral to travel to Yuma. Amaral arrived in Yuma on September 8, 1991. He spent the next several days with Dickens near the Colorado River. While recreating on the river, Dickens showed Amaral a .38-caliber revolver he had recently acquired. At some point during their time together, Amaral attempted to intimidate Dickens by pointing the loaded revolver at Dickens's head.

Dickens paid for Amaral's food and transportation during his visit to Yuma. However, after a couple of days, Dickens was running low on cash. Therefore, on September 10, 1991, while eating dinner at a Hardee's restaurant in Yuma, Dickens and Amaral discussed "ways to get more money." Dickens suggested they plan a robbery. They flipped a coin to decide who would conduct the first robbery, and Amaral won. Dickens gave Amaral a choice of several locations to commit the robbery, including a convenience store and a highway rest stop. Amaral chose the rest stop, because it was "out of the way," less busy, and "easier."

After leaving the restaurant, Dickens and Amaral drove to a rest area on eastbound Interstate 8, east of Yuma. Dickens removed his .38-caliber revolver from the glove compartment and placed it on the seat of the vehicle. While waiting for the appropriate circumstances to conduct the robbery, an argument ensued between the two. During the argument, Amaral again pointed the revolver at Dickens's head to intimidate him. After waiting and watching at the rest area for approximately three hours, Dickens and Amaral saw Bryan and Laura Bernstein[3] drive into the parallel westbound rest area across

[3]Bryan and Laura were both 22 years old. Married for three years and graduates of Cornell University, they were traveling through Arizona en route to UCLA where they both received fellowships to undertake graduate work.

the interstate. Dickens nodded his head and either handed Amaral the handgun or watched him remove it from the seat. They agreed that, after Amaral robbed the Bernsteins, Amaral would run down the westbound ramp of the rest area where Dickens would pick him up.

Sitting in his truck on the opposite side of the highway, Dickens watched Amaral as he crossed the interstate and approached the Bernsteins. When he reached the Bernsteins, Amaral asked if they had the time. Laura responded, "9:17 [p.m.]." Amaral then pointed the gun at Bryan and demanded his wallet, which Bryan surrendered. Amaral then asked Laura for her wallet, but she did not have one. Amaral ordered the Bernsteins to walk past their car and turn around. From the opposite side of the highway, Dickens observed Amaral moving the Bernsteins across the beams of light from their headlamps. Amaral asked if they were ready to die, then shot Laura point blank in the head. Dickens saw the bright flash of the gun as Amaral shot Laura. Laura fell to the ground, and Bryan crouched down over her. Amaral re-cocked the revolver, pointed it at Bryan, and shot him in the head.

After seeing that Amaral had robbed and shot the Bernsteins, Dickens drove across the median and through the rest area. No evidence suggests Dickens stopped to aid the Bernsteins, called for emergency medical assistance, or otherwise notified the authorities. Dickens picked Amaral up on the westbound side of highway and asked, "Do you have the wallet?" Amaral replied that he did and handed the wallet to Dickens. After searching the wallet and returning it to Amaral, Dickens explained that he had driven through the rest area to make sure "everything was taken care of." They then drove to the home of Dickens's brother, where Amaral removed cash, traveler's checks, and one credit card from Bryan's wallet. Dickens and Amaral burned the wallet and its remaining contents. They split the cash, Amaral pocketed the credit card, and they later destroyed the traveler's checks.

At approximately 9:40 p.m., a deputy sheriff drove into the rest area and found the Bernsteins lying on the ground in front of their vehicle. Laura was dead. Bryan, suffering from a gunshot wound to the head, was semiconscious, thrashing around, and moaning in pain. Bryan told the deputy that he had been threatened with a gun, attacked, and thought he was shot. Bryan died shortly thereafter.

On September 11 (the morning following the murders), Amaral unsuccessfully attempted to use Bryan's credit card at a local K-Mart. That evening, Dickens rented a room at a Motel 6, where he and Amaral spent the night. Early the next morning, Dickens and Amaral parted company. Dickens drove to Carlsbad, California, and Amaral went back to his mother's house.

They met up again in March 1992. At that time, Amaral moved in with Dickens for one to two weeks in a San Diego, California apartment. Amaral's mother, finding that Amaral had left her home, reported Amaral as a runaway and gave Dickens's address to the police. The police conducted an investigation into sex abuse charges against Dickens. San Diego police officers eventually arrested Dickens on charges of sexually abusing Amaral (and other boys) and assault with a deadly weapon.[4] During an interview concerning the alleged abuse, Amaral told officers that he and Dickens had been involved in a double homicide in Yuma.

In April 1992, after further investigation, Dickens was indicted for two counts of premeditated first-degree murder, two counts of felony first-degree murder, one count of conspiracy to commit first-degree murder, one count of conspiracy to commit armed robbery, and two counts of armed robbery. After a trial, he was acquitted of premeditated murder and conspiracy to commit murder but convicted of the felony murders and armed robberies of Bryan and Laura

---

[4]This information was not provided to the jury.

Bernstein, as well as conspiracy to commit armed robbery. Finding no mitigating factors sufficient to call for leniency, the district court sentenced Dickens to death on the felony murder counts.[5] The court further ordered that, if the sentences were ever reduced, the sentences would be served consecutively. The court also sentenced Dickens to fourteen years' imprisonment on the conspiracy and armed robbery convictions, to be served consecutively to the death sentences.

Dickens applied for post-conviction relief from the trial court, which the trial court denied. Dickens then appealed his conviction and sentence to the Arizona Supreme Court. That court affirmed, noting that overwhelming evidence supported the conviction and capital sentences and emphasizing that "this is not a case of lingering doubt." *State v. Dickens*, 926 P.2d 468, 493 (Ariz. 1996) (in banc). Dickens subsequently filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 with the U.S. District Court for the District of Arizona, which the district court denied. We review *de novo* the district court's order denying the petition. *Estrada v. Scribner*, 512 F.3d 1227, 1235 (9th Cir. 2008). Because the relevant state court determination for a habeas petition is the last reasoned state court decision, our review focuses on the Arizona Supreme Court's decision. *See Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 804-06 (1991)).

---

[5]The district court sentenced Dickens to death prior to the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), that juries (rather than courts) must determine the presence or absence of aggravating factors meriting imposition of the death penalty. The procedural rule announced in *Ring* "does not apply retroactively to cases already final on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

## I. The Arizona Supreme Court's application of *Enmund/Tison* to the facts of this case was not objectively unreasonable

Dickens argues the Arizona Supreme Court's application of federal law regarding capital sentences for felony-murder defendants was unreasonable and therefore warrants habeas relief. He specifically contends that his contribution to the murders of Bryan and Laura Bernstein was insufficient to warrant the death penalty. To obtain relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, Dickens must show that the Arizona Supreme Court's decision (1) was "contrary to" clearly established federal law as determined by the Supreme Court, (2) "involved an unreasonable application of such law," or (3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 785 (2011) (quoting 28 U.S.C. § 2254) (internal quotation marks omitted).

"A decision is 'contrary to' federal law when the state court applies a rule of law different from that set forth in the holdings of Supreme Court precedent or when the state court makes a contrary determination on 'materially indistinguishable' facts." *Earp v. Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]o determine whether a state court failed to apply 'clearly established Federal law' . . . we must distinguish between situations where a legal principle established by a Supreme Court decision clearly extends to a new factual context . . . and where it does not . . . ." *Moses v. Payne*, 555 F.3d 742, 753 (9th Cir. 2009). When Supreme Court "cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (internal quotation marks and citations omitted). "[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted). "Rather, that application must be objectively unreasonable." *Id.* at 76.

**[1]** The applicable rules in this case come from *Enmund*, 458 U.S. 782, and *Tison*, 481 U.S. 137, which were both decided prior to Dickens's 1993 conviction. In *Enmund*, the Supreme Court reversed the death sentence of a defendant convicted under Florida's felony-murder rule. 458 U.S. at 798. Enmund drove the getaway car in an armed robbery of a dwelling. His accomplices murdered an elderly couple who resisted the robbery. *Id.* at 784-86. The Court determined that Enmund "did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." *Id.* at 795. Therefore, the Court concluded that putting Enmund to death, "to avenge two killings that he did not commit and had no intention of committing or causing," would not achieve the deterrent or retributive goals of the death penalty and was therefore unconstitutional. *Id.* at 800-01.[6]

**[2]** *Tison* created an exception to *Enmund* for felony-murder defendants whose "[1] major participation in the felony committed, [2] combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." 481 U.S. at 158. The defendants in *Tison*

---

[6]The *Enmund* Court, "citing the weight of legislative and community opinion, found a broad societal consensus, with which it agreed, that the death penalty was disproportional to the crime of robbery-felony murder '*in these circumstances.*' " *Tison*, 481 U.S. at 147 (emphasis added) (quoting *Enmund*, 458 U.S. at 788). However, the Court acknowledged that "[i]t would be very different if the *likelihood of a killing in the course of a robbery were so substantial* that one should share the blame for the killing if he somehow participated in the felony.' " *Enmund*, 458 U.S. at 799 (emphasis added).

helped their father and his cellmate—both convicted murderers—escape from prison, armed them with shotguns, helped flag down and kidnap a family on an isolated road, drove the family to a remote site, and then stood by as their father and his cellmate murdered the four family members. *Id.* at 139-41. The Court distinguished *Enmund*, explaining that the defendant in that case "did not actively participate in the events leading to death (by, for example, as in the present case, helping abduct the victims) and was not present at the murder site." *Id.* at 145. By contrast, the *Tison* defendants were major participants in the felony committed because: (1) they "actively participated in the events leading to the death by, *inter alia*, providing the murder weapons and helping abduct the victims"; (2) they were "present at the murder site, [and] did nothing to interfere with the murders"; (3) they "ma[de] no effort to assist the victims before, during, or after the shooting"; (4) "after the murders [they] continued on the joint venture"; and (5) they "could anticipate the use of lethal force" during the commission of their crimes. *Id.* at 145, 151-52. Therefore, the *Tison* Court concluded the defendants' participation was sufficient to warrant capital punishment. *Id.* at 158.[7]

## A.  Major participation

[3] The Arizona Supreme Court determined that Dickens was a major participant in the murder of Bryan and Laura Bernstein, because: (1) "[t]he robberies were premeditated, planned, and agreed on by [Dickens] and Amaral"; (2) "[Dickens] furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies"; (3) "[Dickens] drove Amaral to the scene; (4) "[Dickens] waited while Amaral committed the robberies"; (5) "[Dickens] picked up Amaral after the crime"; and (5)

---

[7]The Court remanded for further proceedings to determine whether the defendants acted with reckless disregard for human life. *Tison*, 481 U.S. at 158.

"[Dickens] witnessed the destruction of evidence, and failed to report the crimes." *Dickens*, 926 P.2d at 490. The Arizona court's application of federal law was not objectively unreasonable, because Dickens's conduct nearly matches that of the *Tison* defendants. Dickens was actively involved in every aspect of the deadly crime—planning the robbery, staking out the crime scene, targeting the victims, arming Amaral with a handgun,[8] watching the murders, aiding Amaral's escape, destroying evidence, and helping Amaral evade capture. Dickens was clearly a major participant in the crime.

[4] Nonetheless, Dickens argues his conduct was more akin to the defendant in *Enmund* than to the defendants in *Tison*. Most notably, he argues that *Enmund* and *Tison* require a defendant's immediate physical presence at the murder scene to qualify for the death penalty. However, nowhere in *Enmund* or *Tison* does the Supreme Court clearly establish that "presence" at a murder scene is a mandatory prerequisite for the death penalty. Instead, physical presence is one of several factors relevant to the "major participation" prong of the *Tison* analysis. 481 U.S. at 158. In addition to their presence at the murder scene, the defendants in *Tison* were "actively involved in every element" of the crime because, among other things, they (1) helped plan the underlying crimes (kidnaping and robbery), (2) provided the murder weapons, (3) made no effort to assist the victims after the shooting, (4) helped the perpetrators flee, and (5) continued in the criminal venture after the murders were committed. *Id.* at 145, 151-52, 158. The *Tison* Court never stated that one factor was more important than another factor; it simply concluded that the defen-

---

[8]The dissent argues that the Arizona Supreme Court did not determine that Dickens armed Amaral. The Arizona Supreme Court noted only that Dickens either furnished the weapon or knew Amaral had the weapon in its "Death eligibility" discussion. *Dickens*, 926 P.2d at 490. However, in a different section under the same "Sentencing Issues" section, the Arizona Supreme Court stated that Dickens "was admittedly intimately familiar with Amaral's violent temper and impulsiveness, yet he provided Amaral with a gun . . . ." *Id.* at 492.

dants' actions collectively demonstrate a "high level of participation . . . [that] implicates them in the resulting deaths." *Id.* at 158.

By sharp contrast, "the only evidence of the degree of [Enmund's] participation [was] the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes[,] . . . waiting to help the robbers escape . . . ." *Enmund*, 458 U.S. at 786. There was no evidence that Enmund provided the murder weapons, knew of the shooters' violent propensities, planned the underlying crime, or continued to assist the perpetrators after they murdered their victims. His *only* participation was that of getaway driver. *Id.* at 786 n.2.

Here, the facts support the Arizona Supreme Court's determination that Dickens's participation was similar to that of the defendants in *Tison*, rather than the defendant in *Enmund*. "Far from merely sitting in a car away from the actual scene of the murders," *Tison*, 481 U.S. at 158, Dickens planned the underlying armed robbery, provided the murder weapon or knew Amaral had the weapon, watched Amaral shoot the victims, made no effort to assist the victims after the shooting, helped Amaral flee the scene, assisted in the destruction of evidence, continued in the criminal venture after the murders were committed, and failed to report the murders to the authorities. These facts, *taken together*, demonstrate a "high level of participation . . . [that] implicates [Dickens] in the resulting deaths." *Tison*, 481 U.S. at 158. Dickens was no doubt a "major participant."

Additionally, even if *Tison* and *Enmund* could be read to incorporate a mandatory "presence" requirement, it seems that the Arizona Supreme Court suggested that Dickens met that requirement. The Supreme Court has never defined the word "presence" as it pertains to the major participation in a capital crime. The Arizona Supreme Court had as its guide only the two contrasting examples of presence in *Enmund* and *Tison*.

In *Enmund*, where the defendant sat in a car outside the home
where two victims were shot to death and neither heard nor
observed the murders, the Court concluded the defendant
"was not present when the killing took place." 458 U.S. at
795. In *Tison*, where the defendants stood by as four people
were gunned down, the Court determined the defendants *were*
sufficiently "present" at the murder site. 481 U.S. at 145. It
is not clear how close the *Tison* defendants stood to the vic-
tims when they were murdered, but we can fairly assume they
were close enough to watch the crime as it happened.[9]

Here, Dickens testified at trial that he watched each part of
the Bernsteins' murders as they unfolded. After planning the
armed robbery, staking out the rest area for several hours in
search of potential victims, and selecting the Bernsteins as
they parked on the opposite side of the highway, Dickens (1)
watched Amaral leave the truck with a loaded .38-caliber
handgun, knowing Amaral was going to rob the Bernsteins at
gunpoint; (2) watched Amaral walk across the highway; (3)
observed Amaral moving the Bernsteins around the front of
their car in the path of the illuminated headlamps; and (4) saw
flashes as Amaral shot the victims in the head. Dickens then
drove through the rest stop to pick Amaral up, and (to use his
words) verify "everything had been taken care of" (i.e., verify
the victims had been shot). Given the language of the
Supreme Court in *Tison*, Dickens was present at this murder.
In any event, because Supreme Court "cases give no clear
answer to the question" of mandatory or minimum presence

---

[9]There was apparently some dispute as to the *Tison* defendants' involve-
ment in and proximity to the murders: "Ricky claimed to have a somewhat
better view than Raymond did of the actual killing. Otherwise, the [Ari-
zona] court noted, Ricky Tison's participation was substantially the same
as Raymond's." 481 U.S. at 145. The defendants may have actually
walked *away* from the murder scene to fetch a water jug for the victims
"when [they] started hearing the shots." *Id.* at 141. However, because both
defendants "*watched* Gary Tison and Greenawalt fire in the direction of
the victims," they were sufficiently "present" at the murder scene. *Id.* at
141, 144-45, 157 (emphasis added).

at the murder scene, "it cannot be said that the state court unreasonably applied clearly established Federal law." *Wright*, 552 U.S. at 126 (internal quotation marks, alterations, and citations omitted). Therefore, the Arizona Supreme Court's determination that Dickens was a major participant in the murders did not rest on an objectively unreasonable application of Supreme Court precedent. *Lockyer*, 538 U.S. at 76.

## B.  Reckless indifference to human life

**[5]** The second prong of the *Tison* analysis requires the felony-murder defendant to exhibit "reckless indifference to human life" sufficient to satisfy *Enmund*'s culpability requirement for capital punishment. 481 U.S. at 158. The *Tison* Court observed that

> some nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill." Indeed it is for this very reason that the common law and modern criminal codes alike have classified behavior such as occurred in this case along with intentional murders.

*Id.* at 157 (citations omitted). The Court held that "reckless disregard for human life implicit in knowingly engaging in criminal activities *known to carry a grave risk of death* represents a highly culpable mental state" sufficient to warrant capital punishment "when that conduct causes its *natural, though also not inevitable, lethal result*." *Id.* at 157-58 (emphasis added). The Court further noted that a defendant's major par-

ticipation in a dangerous felony "often provide[s] significant support" for a finding of reckless indifference. *Id.* at 158 n.12.

Applying *Tison*, the Arizona Supreme Court concluded that Dickens acted with a reckless indifference to human life because, (1) in addition to the factors demonstrating his major contribution to the crimes, Dickens (2) armed Amaral with the .38-caliber revolver, (3) knowing that "Amaral had a violent and explosive temper," and (4) "failed to render aid" to the Bernsteins. *Dickens*, 926 P.2d at 490.[10] Given these facts, the Arizona Supreme Court's conclusion that Dickens exhibited a reckless indifference to human life was not objectively unreasonable.

Dickens argues this conclusion was unreasonable, because armed robbery is not a crime "known to carry a grave risk of death." However, Dickens failed to cite any U.S. Supreme Court precedent, and we know of none, clearly establishing this principle. Moreover, even if the garden variety armed robbery were not known to carry a grave risk of death, the question here is whether the circumstances of Dickens's crime were known to carry a grave risk of death and caused their "natural, though also not inevitable, lethal result." *Tison*, 481 U.S. at 157.

**[6]** Like the armed robbery in *Tison*, this was no ordinary heist. The facts support the Arizona Supreme Court's determination that Dickens knew there was a grave risk of death in sending an explosive adolescent with a history of violence to commit armed robbery. From his experience working at the Oak Grove Institute (a treatment center for violent juveniles), Dickens knew that Amaral was a high risk patient with a "vio-

---

[10]As the *Tison* Court noted, although the "major participation" and "reckless indifference to human life" requirements are stated separately, "they often overlap." 481 U.S. at 158 n.12. The Arizona Supreme Court thus considered the factors demonstrating major participation as significant support for a finding of reckless indifference to human life.

lent and explosive temper." *Dickens*, 926 P.2d at 490. He knew that Amaral had beaten up a nurse at Oak Grove and had a long history of carrying guns. Amaral *twice* attempted to intimidate Dickens—once at the river and once immediately before the robbery—by pointing the loaded .38-caliber revolver at Dickens's head. Amaral also bragged about being involved in other murders. Even with this knowledge, Dickens proceeded with the robbery. He either furnished Amaral with his .38-caliber revolver, or knew Amaral had the gun, and directed Amaral to rob the Bernsteins on the opposite side of the highway. Like the defendants in *Tison*, who armed two convicted murderers and helped plan and orchestrate the armed robbery, Dickens "could have foreseen that lethal force might be used" in the course of the robbery. 481 U.S. at 151-52; *accord Foster v. Quarterman*, 466 F.3d 359, 370-71 (5th Cir. 2006) (denying habeas relief to a death row petitioner convicted of capital murder as an accomplice because he displayed reckless indifference to human life by driving two armed co-conspirators from victim to victim to commit armed robbery, which is a criminal activity "known to carry a grave risk of death").

Further, after watching the shootings, Dickens, like the defendants in *Tison*, chose to "aid [Amaral,] whom he had placed in the position to kill[,] rather than [aid the] victims." *Tison*, 481 U.S. at 152; *see id.* ("These facts not only indicate that the Tison brothers' participation in the crime was anything but minor; they also would clearly support a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life."). Dickens helped Amaral flee the scene of the murder, destroy evidence, and evade capture.

**[7]** In light of these facts, we cannot say that the Arizona Supreme Court's determination that Dickens exhibited a reckless indifference to human life rested on an objectively unreasonable application of *Enmund* and *Tison*.

## II.   The Arizona Supreme Court's decision was not based on an unreasonable determination of the facts in light of the evidence presented at trial

Dickens argues that the Arizona court's *Enmund/Tison* analysis was based on an unreasonable determination of the facts, because (1) Amaral was not a credible witness; and (2) there was no evidence that (a) Dickens knew Amaral intended to rob or kill the Bernsteins, (b) Dickens knew of Amaral's violent propensities, or (c) Dickens knew one of the victims might still be alive when he and Amaral left the rest area. Dickens "may obtain relief only by showing the [Arizona court's] conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(d)(2)).

**[8]** Dickens recites testimony and evidence presented at trial showing inconsistent statements from Amaral, contradictory testimony from Amaral's fellow prisoners, and the jury's ultimate rejection of Amaral's testimony about an alleged walkie-talkie conversation between Dickens and Amaral at the murder scene.[11] Aside from casting doubt on Amaral's credibility—a factor which the state court and jury no doubt considered at trial[12]—these general allegations do little more than attempt to relitigate the jury's factual findings and credit Dickens's testimony (over that of Amaral) that Dickens had no part in the crimes. We agree with the Arizona Supreme Court that we must "defer to the jury and the [trial] judge

---

[11]Amaral's testimony regarding the walkie-talkie conversation (in which Dickens allegedly instructed Amaral not to leave any witnesses) is irrelevant, because neither the trial court nor the Arizona Supreme Court relied on this testimony in their discussion of the evidence supporting the *Enmund/Tison* findings. *See Dickens*, 926 P.2d at 490-91.

[12]For example, the jury did not convict Dickens of premeditated murder or conspiracy to commit murder, in part, because it did not believe Amaral's testimony that Dickens ordered him to kill the Bernsteins over a two-way radio.

regarding Amaral's credibility." *Dickens*, 926 P.2d at 490; *see United States v. Johnson*, 229 F.3d 891, 894 (9th Cir. 2000) ("[W]e are powerless to question a jury's assessment of witnesses' credibility . . . ." (internal quotation marks omitted)). Absent persuasive evidence that any *particular* determination of fact was unreasonable, Dickens cannot prevail under § 2254(d)(2) by raising a general challenge to Amaral's credibility.

**[9]** As to Dickens's specific factual challenges, sufficient evidence presented at trial supported the Arizona Supreme Court's findings to make those findings reasonable. Dickens first argues that no evidence in the record supports the Arizona courts' determination that he knew about or helped plan the robbery. However, Amaral testified at length about their common scheme to commit armed robbery. Dickens has not explained why the Arizona courts' reliance on *this* particular testimony from Amaral was unreasonable. Moreover, Dickens himself testified that he knew about the robbery. Dickens admitted at trial and to police investigators that he and Amaral staked out the rest area on the west side of the highway, he saw the victims when they pulled into the rest area, he watched Amaral take the revolver as he walked away from the vehicle, and he watched Amaral shoot the victims across the highway. Most significantly, Dickens also admitted that (1) he "figured [Amaral] was going to . . . go over there and rob those people" when Amaral left the truck, and (2) Amaral *told* him he was going to rob the Bernsteins. In light of this evidence, the Arizona Supreme Court's determination that Dickens knew about and agreed to the robbery was not unreasonable.

Second, Dickens argues the evidence in the record does not support the Arizona courts' determination that he knew about Amaral's violent propensities. This is plainly incorrect. Dickens originally met Amaral at the Oak Grove Institute *for violent juveniles*. Dickens learned, while working at Oak Grove, that Amaral was a "high risk" patient, had battered a nurse,

and frequently bragged about carrying guns and committing violent crimes, including murder. He further testified that he had *personally seen* Amaral carrying guns on several occasions before the September 1991 murders. Lastly, Amaral *twice* pointed the loaded .38-caliber revolver at Dickens's head to intimidate him. In light of Dickens's own admissions, we cannot say the Arizona Supreme Court's determination that Dickens knew of Amaral's violent nature was unreasonable.

**[10]** Finally, Dickens argues that no evidence in the record supports the Arizona courts' determination that Dickens "failed to render aid knowing that one victim might not be dead." This finding relates to the Arizona Supreme Court's determination that Dickens exhibited a reckless indifference to human life, but it was not a dispositive factor in that determination. In *Tison*, the U.S. Supreme Court concluded that the defendants exhibited reckless indifference, in part, because they "watched the killing" and then "chose to aid those whom [they] had placed in the position to kill rather than their victims." 481 U.S. at 152. Nothing suggests the defendants in *Tison* knew anyone had survived; rather, the deciding factors were the defendants' (1) knowledge that victims had been shot and (2) decision to aid the shooters over the victims. Dickens, like the *Tison* defendants, watched Amaral shoot the Bernsteins, but decided to aid Amaral over the Bernsteins. There is no evidence that Dickens attempted to aid the Bernsteins, summoned medical assistance, or otherwise notified the authorities. Instead, he helped Amaral flee the scene, destroy evidence, and evade capture. Because Dickens's uncontested knowledge of the Bernsteins' *shooting* (rather than Bryan's *survival*) is the critical factor in the *Enmund/Tison* reckless indifference analysis, the Arizona Supreme Court did not "base" its decision on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).[13]

---

[13]Some evidence in the record also supports this factual determination. For example, Amaral testified that Dickens drove through the rest stop to

### III. Dickens defaulted on his ineffective assistance of counsel claim by failing to fairly present the claim to the Arizona courts, but he may have shown cause under *Martinez v. Ryan*

Dickens lastly petitions this court for habeas relief on the basis of his counsel's ineffective assistance during sentencing. Dickens argues his counsel failed to conduct a thorough investigation of Dickens's background and prepare the defense expert with the necessary tools to present compelling mitigation evidence. The district court determined that this argument was procedurally defaulted, because it was not exhausted in state court. "A federal court may not grant habeas relief to a state prisoner unless he has properly exhausted his remedies in state court." *Peterson v. Lampert*, 319 F.3d 1153, 1155 (9th Cir. 2003) (citing 28 U.S.C. § 2254(b); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991)). To demonstrate that he exhausted his federal habeas corpus claim in state court, Dickens's "claim . . . must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle [him] to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

### A. Fair presentation in state court

**[11]** Constitutional claims must be "fairly presented" in state court to provide those courts an opportunity to act on them. *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam). "It would be contrary to [the] purpose [of Section

---

verify that "everything had been taken care of." Officers testified that, when they arrived at the rest stop shortly after the shooting, Bryan Bernstein was still alive and "thrashing" around in pain. At a minimum, Dickens failed to provide aid when one victim was, in fact, still alive. Given what the deputy sheriff encountered at the rest area, it is likely that Bryan exhibited signs of life and/or was thrashing around in pain when Dickens drove through the rest area. Nonetheless, we need not determine whether the Arizona courts' determination was reasonable, because this finding is not critical to the *Enmund/Tison* analysis.

2254(b)] to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*." *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1399 (2011). Therefore, a claim has not been fairly presented in state court if new factual allegations (1) "fundamentally alter the legal claim already considered by the state courts," *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Beaty v. Stewart*, 303 F.3d 975, 989-90 (9th Cir. 2002), or (2) "place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it," *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988); *accord Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988).

In *Aiken*, the habeas petitioner presented new evidence (consisting of a decibel sound test performed by an expert) which strengthened his claim that the interrogating officers heard him request counsel. 841 F.2d at 883. The court held that his right to counsel claim was unexhausted, because the new decibel evidence "substantially improve[d] the evidentiary basis for [his] right-to-counsel and voluntariness arguments, thereby presenting the very type of evidence which the state should consider in the first instance." *Id.* Similarly, in *Nevius*, this court held that a habeas petitioner failed to exhaust his *Batson* claim in state court where he attempted to introduce new and substantial supporting evidence on appeal. 852 F.2d at 469-70. At oral argument and in his appellate briefs, Nevius made

> serious allegations concerning comments by the prosecutor alleged to have been made to defense counsel sometime during 1986. Those representations, if proven, might have presented in a different light the factual issues concerning the motivation of the prosecutor in exercising his peremptory challenges. The alleged remarks, however, . . . have not been presented to the state courts, either on appeal or during post-conviction proceedings. In habeas pro-

ceedings, the federal courts are not free to entertain new evidence that places the claim in a *significantly different posture*, when that evidence was never presented to the state courts. . . .

If there is evidence that should be presented to the state courts, then the attempt must first be made to present it there and to make a record. Only thereafter, under the appropriate procedural strictures, may the matter be addressed in federal court.

*Id.* (emphasis added) (internal citations omitted).[14]

In this case, Dickens argued to the Arizona trial court that his sentencing counsel provided ineffective assistance. Dickens claimed, among other things, that sentencing counsel did

---

[14]Our holdings in *Aiken* and *Nevius* are consistent with case law in the Fourth, Fifth, Sixth, and Tenth Circuits. *See, e.g.*, *Smith v. Quarterman*, 515 F.3d 392, 402 (5th Cir. 2008) (dismissing habeas petition for failure to exhaust because new evidence "regarding [petitioner]'s childhood and the effects of his substance abuse . . . constitute 'material additional evidentiary support [presented] to the federal court that was not presented to the state court' " (citation omitted)); *Demarest v. Price*, 130 F.3d 922, 938-39 (10th Cir. 1997) (finding failure to exhaust because "new evidence submitted to the district court by [the petitioner] transformed his ineffective assistance of counsel claim into one that was 'significantly different and more substantial' " (citation omitted)); *Wise v. Warden, Md. Penitentiary*, 839 F.2d 1030, 1033 (4th Cir. 1988) ("The exhaustion doctrine is not satisfied where a federal habeas petitioner presents evidence which was not presented to the state court and which places his case 'in a significantly different and stronger evidentiary posture than it was when the state courts considered it.' " (citation omitted)); *Sampson v. Love*, 782 F.2d 53, 57-58 (6th Cir. 1986) (dismissing habeas petition for failure to exhaust when stronger evidence presented in the federal hearing showed that jurors actually knew about petitioner's previous sentence); *Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983) ("Where a federal habeas petitioner presents . . . evidence not before the state courts such as to place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, the state courts must be given an opportunity to consider the evidence.").

not direct the work of the court-appointed psychologist, Dr. Todd A. Roy, and did not adequately investigate Dickens's background. In preparation for his testimony, sentencing counsel provided Dr. Roy with several boxes of material documenting Dickens's history. Dr. Roy later "adduced information from [Dickens] relative to a possible medical or mental condition." However, Dickens alleged that sentencing counsel (1) "conducted no investigation whatsoever into the possibility [Dickens] was suffering from any medical or mental impairment," and (2) failed to direct Dr. Roy to any particular mitigating evidence. The trial court rejected this claim on the merits, finding that sentencing counsel's performance was not constitutionally deficient and that Dickens "failed to demonstrate that he was prejudiced by any performance of defense counsel." Considering the same arguments raised to the trial court, the Arizona Supreme Court summarily denied Dickens's *Strickland* claim on appeal.

[12] In federal court, Dickens changed his claim to include extensive factual allegations suggesting Dickens suffered from Fetal Alcohol Syndrome ("FAS") and organic brain damage. Dickens argues that sentencing counsel's failure to uncover and present these specific mitigating conditions amounted to constitutionally deficient performance under *Strickland v. Washington*, 466 U. S. 668 (1984). This new evidence creates a mitigation case that bears little resemblance to the naked *Strickland* claim raised before the state courts. There, Dickens did not identify any specific conditions that sentencing counsel's allegedly deficient performance failed to uncover, averring only generally that sentencing counsel did not effectively evaluate whether Dickens "suffer-[ed] from any medical or mental impairment." Evidence of specific conditions (like FAS and organic brain damage) clearly places Dickens's *Strickland* claim in a "significantly different" and "substantially improved evidentiary" posture. *See Nevius*, 852 F.2d at 470; *Aiken*, 841 F.2d at 883. As such, the Arizona courts did not have a fair opportunity to evaluate Dickens's ineffective assistance of counsel claim. Therefore,

the district court correctly determined that Dickens's newly-enhanced *Strickland* claim is procedurally barred.

Dickens argues the district court erred, because he established a sufficient factual basis to exhaust his claim in state court according to the Ninth Circuit's holdings in *Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999), *Pinholster v. Ayers*, 590 F.3d 651 (9th Cir. 2009) (en banc), *reversed on other grounds*, *Cullen*, 131 S. Ct. at 1398, and *Lopez v. Schriro*, 491 F.3d 1029 (9th Cir. 2007). His reliance on these cases is misplaced. In *Weaver*, we rejected the argument that a habeas petitioner failed to exhaust his claim in state court, because he modified the factual basis for his bailiff misconduct claim on appeal. 197 F.3d at 364-65. As we explained, "Weaver's inability to fully explore what transpired during that incident [between the bailiff and the jury] stemmed from the state courts' refusal to grant him an evidentiary hearing on the matter, rather than from any failure of diligence on his part." *Id.* at 364. We noted further that the petitioner "pressed this same claim" before the state and federal courts: the bailiff made an inappropriate comment that coerced the jury into rendering a premature decision, which violated Weaver's due process and equal protection rights. *Id.* The only change in Weaver's claim was the precise wording of the bailiff's comment, which was clarified at the evidentiary hearing. *Id.*

In *Pinholster*, we determined that a habeas petitioner's ineffective assistance of sentencing counsel claim was sufficiently exhausted, because: (1) he "exercised diligence in pursuing an evidentiary hearing in state court regarding his mitigation ineffective assistance claim"; and (2) "both the federal and the state habeas petitions detail *many substantially identical facts*, including . . . Pinholster's home life as a child, and Pinholster's educational, medical, social, psychological, and family background." 590 F.3d at 668-69 (emphasis added). We further noted that, "[a]lthough Pinholster substituted experts during the proceedings who ultimately developed different mental impairment theories, these experts

nonetheless relied on the *same background facts* that Pinholster presented to the state court." *Id.* at 669 (emphasis added).

Finally, in *Lopez*, we held that a capital habeas petitioner exhausted his *Strickland* claim in state court, because he asserted sufficient evidence of the mitigating conditions to the state court. 491 F.3d at 1041. Lopez argued in federal court that his post-conviction counsel failed to uncover and present evidence of organic brain damage, dysfunctional childhood, and alcohol abuse. *Id.* at 1040-41. We concluded that this argument was properly exhausted, because "the state court record contain[ed] some evidence of a dysfunctional childhood and alcoholism." *Id.* at 1041. However, we did not allow Lopez to supplement the record with additional evidence of prejudice on his ineffective assistance of sentencing counsel claim. *Id.* at n.8 ("We note that Lopez apparently wishes to supplement the record in federal court with additional evidence . . . that was not presented to the state courts. On remand, the district court will therefore need to determine whether Lopez . . . is entitled to supplement the record . . . ." (citing 28 U.S.C. § 2254(e)(2)). Thus, *Lopez* did not determine whether a habeas petitioner can *add* evidence to his claim on federal appeal that would render the claim unexhausted.

This case is distinguishable from *Weaver*, *Pinholster*, and *Lopez*. Dickens's factual allegations in federal court do not (1) amount to a minor change in the semantics of already-presented evidence, *see Weaver*, 197 F.3d at 364-65; (2) present "substantially identical facts" to those alleged in state court, *see Pinholster*, 590 F.3d at 668-69; or (3) build upon the same background evidence presented in state court, *see Lopez*, 491 F.3d at 1041. Dickens never discussed his mother's alcohol consumption during pregnancy or any specific circumstances that would have caused organic brain damage in state court. He also does not dispute that he never specifically raised FAS or organic brain damage as mitigating factors in state court. Thus, Dickens's new factual allegations do

not build upon specific factual allegations made in state court. This case is similar to *Smith v. Quarterman*, in which the Fifth Circuit determined that a petitioner's inclusion of new and more specific evidence "regarding [his] childhood and the effects of his substance abuse . . . constitute[s] 'material additional evidentiary support' " for his *Strickland* claim. 515 F.3d 392, 402 (5th Cir. 2008) (holding that petitioner's claim was procedurally barred).

**[13]** In sum, Dickens's *Strickland* claim is procedurally barred, because the new evidence of prejudice was not fairly presented to the state courts. This new evidence substantially improves the evidentiary posture of Dickens's claim in federal court. *See Peterson*, 319 F.3d at 1156 ("When a prisoner has deprived the state courts of a fair opportunity to pass on his claim and state procedural rules bar him from returning to state court, he has procedurally defaulted and is ineligible for federal habeas relief unless he can show 'cause and prejudice.' " (citation omitted)).

### B.   Cause and prejudice

Dickens argues that, even if his claim is unexhausted, the ineffective assistance of his post-conviction relief ("PCR") counsel—in failing to raise the FAS and organic brain damage claims to the Arizona Supreme Court—constitutes cause to overcome the default. *See Coleman*, 501 U.S. at 749-50 ("Under *Sykes* and its progeny, an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto' . . . ." (citations and internal quotation marks omitted)). To establish cause for a procedural default, "a petitioner must demonstrate that the default is due to an external objective factor that cannot fairly be attributed to him." *Smith v. Baldwin*, 510 F.3d 1127, 1146 (9th Cir. 2007) (en banc) (internal quotation marks omitted)). "Attorney ignorance or inadvertence is not cause, but attorney error rising to the level of an

independent constitutional violation (in the form of ineffective assistance of counsel) does constitute cause." *Moormann v. Schriro*, 426 F.3d 1044, 1058 (9th Cir. 2005) (citing *Coleman*, 501 U.S. at 753-54).

The district court held that Dickens's ineffective-assistance-of-PCR-counsel claim may not constitute cause to excuse the procedural default of his newly-enhanced ineffective-assistance-of-sentencing-counsel claim. The district court supported its holding by noting that ineffective assistance of PCR counsel cannot rise to the level of an independent constitutional violation sufficient to constitute cause, because there is no constitutional right to counsel in state PCR proceedings. The district court's conclusion was correct under the then-existing, clear circuit law. *See, e.g.*, *Smith*, 510 F.3d at 1146-47 ("[B]ecause 'there is no constitutional right to an attorney in state post-conviction proceedings,' attorney ineffectiveness 'in the post-conviction process is not considered cause for the purpose[ ] of excusing the procedural default at that state." (internal quotation marks, alterations, and citations omitted)); *Manning v. Foster*, 224 F.3d 1129, 1133 (9th Cir. 2000) ("[T]here is no constitutional right to an attorney in state post-conviction proceedings. Therefore, any ineffectiveness of [the defendant's] attorney in the post-conviction process is not considered cause for the purposes of excusing the procedural default at that stage." (citation omitted)). As an additional ground for denying Dickens's claim for cause, the district court cited *Murray v. Carrier*, 477 U.S. 478, 489 (1986), and held that Dickens was required to (but did not) present his claim of ineffective assistance of PCR counsel to the state courts as an independent claim in order for it to be used to establish cause.

**[14]** However, in *Martinez v. Ryan*, the Supreme Court found "it . . . necessary to modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." 132 S. Ct. 1309, 1315 (2012). *Martinez*

creates a narrow exception to *Coleman*: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."[15] *Id.* "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 1320. The Supreme Court expressly held this to be a narrow equitable ruling and not a constitutional ruling. *Id.* at 1318-20. For a prisoner to meet this equitable rule establishing cause for a procedural default in a scenario applicable to this case, the prisoner must demonstrate that "counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . . ." *Id.* at 1318. In addition, "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Id.* at 1318-19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for issuing certificates of appealability)).

**[15]** Here, Dickens argues that ineffective assistance of his PCR counsel caused the procedural default and Arizona requires ineffective-assistance-of-sentencing-counsel claims to be raised in a defendant's first collateral proceeding—i.e., an initial-review collateral proceeding. Therefore, the newly announced rule in *Martinez* may provide a path for Dickens to establish cause for the procedural default of his newly-enhanced claim of ineffective assistance of sentencing counsel, if he can show that the claim is substantial and that his

---

[15]*Martinez* defines an initial-review collateral proceedings as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1315.

PCR counsel was ineffective under *Strickland*. Thus, we vacate the district court's ruling regarding whether cause existed to overcome the procedural default of Dickens's newly-enhanced claim of ineffective assistance of sentencing counsel. We remand for the district court to consider the issue anew in light of *Martinez*. *See Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1206 (9th Cir. 2012) ("Because the district court did not have the benefit of recent Supreme Court authority, we vacate the ruling on these grounds and remand.").

Appellees present various arguments why *Martinez* does not apply to Dickens's situation. We decline to address all but one of these arguments based on our remand to the district court to decide the applicability and impact of *Martinez*.

Appellees argue that *Martinez* does not apply, because the assertion of ineffective assistance of PCR counsel as cause must itself be exhausted or it is procedurally barred. Without the benefit of *Martinez*, the district court held that Dickens could not assert his claim of ineffective assistance of counsel as cause without first presenting it (i.e., an independent claim) to the state courts. Although the district court had reasonable grounds for its conclusion, *see Edwards v. Carpenter*, 529 U.S. 446, 451-54 (2000); *Murray*, 477 U.S. at 489, reading the case law supporting such a conclusion with *Martinez* now indicates that no such requirement exists in the narrow circumstances when *Martinez* applies.

**[16]** *Martinez*'s equitable rather than constitutional ruling and its own factual background lead us to conclude that an ineffective assistance of PCR counsel claim used to establish cause for a procedural default of a claim for ineffective assistance of sentencing counsel need not be exhausted itself. It is true that "ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." *Edwards*, 529 U.S. at 451 (alterations in original). Further, it is true that "the

exhaustion doctrine . . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray*, 477 U.S. at 488-89 (citation omitted). However, it appears that the first time the petitioner in *Martinez* argued ineffective assistance of PCR counsel was in his federal habeas petition. *See Martinez v. Ryan*, 132 S. Ct. at 1314; *Martinez v. Schriro*, 623 F.3d 731, 734 (9th Cir. 2010), *rev'd by Martinez v. Ryan*, 132 S. Ct. 1309. Notwithstanding, the Supreme Court did not find the claim barred for not being presented to the state courts. Therefore, there seems to be no requirement that the claim of ineffective assistance of PCR counsel as cause for a ineffective-assistance-of-sentencing-counsel claim be presented to the state courts.

**[17]** Furthermore, as Dickens points out, "[t]he question whether there is cause for a procedural default does not pose any occasion for applying the exhaustion doctrine when the federal habeas court can adjudicate the question of cause—a question of federal law—without deciding an independent and unexhausted constitutional claim on the merits." *Murray*, 477 U.S. at 489. *Martinez* describes the claim of ineffective assistance of PCR counsel (in an initial-review collateral proceeding) as cause for the procedural default of a claim for ineffective assistance of sentencing counsel as a "narrow exception" to *Coleman*, 501 U.S. 722, and as an equitable ruling, not a constitutional ruling. *Martinez*, 132 S. Ct. at 1315, 1318-1319. In *Martinez*, the Supreme Court notes that it did not make a constitutional ruling, and "[a] constitutional ruling would provide defendants a freestanding constitutional claim . . . ." *Id.* at 1319. In other words, *Martinez* did not create a constitutional right to effective assistance of counsel in PCR proceedings. Thus, the claim of ineffective assistance of PCR counsel used to establish cause in the narrow circumstances outlined in *Martinez* is an equitable claim and not a constitutional claim, *see Coleman*, 501 U.S. at 755 ("[T]here is no right to counsel in state collateral proceedings."), and there-

fore, the claim for cause need not be exhausted as suggested in *Murray*.

Even if the exhaustion requirement were to apply, a federal habeas petition may be granted even though a claim is not exhausted if "there is an absence of available State corrective process . . . ." 28 U.S.C. § 2254(b)(1)(B)(i); *see Teague v. Lane*, 489 U.S. 288, 297-98 (1989) (petitioner failed to raise a claim at trial or direct appeal, which effectively prevented petitioner from raising the claim in collateral proceedings, resulting in the claim being deemed exhausted); *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) ("An exception is made [to the exhaustion requirement] only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief."). Here, a claim of ineffective assistance of PCR counsel does not fit under any of the grounds for relief in PCR proceedings listed in Arizona Rule of Criminal Procedure 32.1. As such, Dickens cannot claim ineffective assistance of PCR counsel in a second PCR petition in Arizona, creating no opportunity to obtain redress. Thus, the claim of ineffective assistance of PCR counsel in an initial review collateral proceeding does not itself need to be exhausted when raised as cause for the procedural default of an ineffective-assistance-of-sentencing-counsel claim.

For the foregoing reasons, the judgment of the district court denying Dickens's petition for writ of habeas corpus is

**AFFIRMED in part, VACATED in part, and REMANDED.**

The parties shall bear their own costs.

REINHARDT, Circuit Judge, dissenting:

The majority opinion allows the State of Arizona to execute Dickens essentially for being the getaway driver in the armed robbery that resulted in the death of the Bernsteins. Yet Supreme Court case law is clear that imposition of the death penalty on one "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" is excessive punishment under the Eighth Amendment. *Enmund v. Florida*, 458 U.S.782, 797 (1982). It is not disputed that Dickens did not kill, attempt to kill, or intend that the Bernsteins be killed. Under *Enmund*, his death sentence is therefore unconstitutional.

The majority attempts to escape the clear holding of *Enmund* by arguing that Dickens falls under the narrow exception created in *Tison v. Arizona*, in which the Supreme Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement" and justifies the imposition of a death sentence on a defendant convicted of felony-murder. 481 U.S. 137, 158 (1987). Dickens, however, was neither a major participant in the commission of the robbery of the Bernsteins, nor was he recklessly indifferent to human life. In fact, nothing material distinguishes Dickens from Enmund, or any other individual who helped plan an armed robbery but whose principal role in the commission of the offense is that of a getaway driver. It is well established under Supreme Court law that the imposition of the death penalty on such a defendant is unconstitutional. The majority reaches the opposite conclusion, however, as the result of misconstruing the record, engaging in improper fact-finding, and relying on unreasonable findings of facts, facts that were not determined by the Arizona Supreme Court; even more important, the majority misconceives the clear import of the two controlling Supreme Court cases, albeit undoubtedly all in good faith.

Because the decision of the Arizona Supreme Court finding that Dickens was death eligible for the murder of the Bernsteins under *Enmund* and *Tison* "involved an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States," *and* "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d), I conclude that we are compelled to reverse the district court's denial of habeas and to grant the writ.

## I.   *Enmund/Tison*

The majority, as did the Arizona Supreme Court, correctly identified the two controlling Supreme Court cases: *Enmund* and *Tison*. In *Enmund*, the Supreme Court held that it was unconstitutional to execute the defendant, who was the getaway driver for an armed robbery of a dwelling, for "two killings that he did not commit and had no intention of committing or causing," namely, the murders of the victims of the robbery by his accomplices. *Enmund*, 458 U.S. at 801. The court determined that such a punishment for felony-murder would meet neither the deterrent nor retributive goals of the death penalty. *Id.* at 798-801. Five years later in *Tison*, the Supreme Court carved out a narrow exception to *Enmund*. *Tison* did not overrule *Enmund*, but rather clarified it by creating an explicit exception; the Court said that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison*, 481 U.S. at 158.

More recently, in *Kennedy v. Louisiana*, the Supreme Court described the holdings in *Enmund* and *Tison* as follows:

> [I]n *Enmund v. Florida*, 458 U.S. 782 (1982), the Court overturned the capital sentence of a defendant who aided and abetted a robbery during which a murder was committed but did not himself kill, attempt to kill, or intend that a killing would take

place. On the other hand, in *Tison v. Arizona*, 481 U.S. 137 (1987), the Court allowed the defendants' death sentences to stand where they did not themselves kill the victims but their involvement in the events leading up to the murders was active, recklessly indifferent, and substantial.

554 U.S. 407, 421 (2008) (emphasis added).

With this legal framework in mind, I analyze the findings of the Arizona Supreme Court (and the separate findings of the majority) in support of their separate conclusions that Dickens satisfied the two requirements for imposition of the death penalty: (1) that he was a major participant in the robbery of the Bernsteins; and (2) that he acted with reckless indifference to human life.

## II.  Major Participant

The Arizona Supreme Court found that Dickens was a major participant in the robbery because:

The robberies were premeditated, planned, and agreed on by [Dickens] and Amaral; [Dickens] furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies; [Dickens] drove Amaral to the scene, waited while Amaral committed the robberies, picked up Amaral after the crime, witnessed the destruction of evidence, and failed to report the crimes.

*State v. Dickens*, 926 P.2d 468, 490 (Ariz. 1996) (in banc) (emphasis added). These findings rest on the role Dickens played in the plan or agreement to commit a robbery and on his role as a driver who witnessed but did not actively participate in the events leading up to the murders. This does nothing to distinguish Dickens from other getaway drivers, and

does not show that his participation in the events leading up to the murder of the Bernsteins was "active" and "substantial." *See Kennedy*, 554 U.S. at 421.

First, the finding that the robbery was "premeditated, planned and agreed on" by Dickens and Amaral, *Dickens*, 926 P.2d at 490, does little to meaningfully distinguish Dickens from any other getaway driver who ordinarily plays a part in the planning of the armed robbery and then drives the car that contains the individuals who actually commit the robbery. The only getaway driver who would not play such a role would be the unwitting or coerced one, such as a driver who is hired to act as a chauffeur for the robbers or one who is blackmailed into doing so. If participating in the planning and serving the ordinary role of the member of the group who drives the car were sufficient to meet the *Enmund* and *Tison* requirements, then almost any participant in a felony would be a major participant. After all, most members of a group committing a robbery will ordinarily participate in the planning of the crime, even if they go on to perform only a minor role in the commission of the crime, such as acting as a lookout or getaway driver.

Second, the Arizona Supreme Court relied on the fact that Dickens "*either* furnished Amaral with the weapon used in the murders *or* knew Amaral had the weapon with him for the robberies." *Id.* at 490 (emphasis added). It so described the facts in the death eligibility section of its opinion, surely a critical section in which petitioner and the federal courts are both entitled to expect accuracy and on which both are unquestionably entitled to rely. What the Arizona Supreme Court's statement means is that while Dickens *may* have furnished Amaral with a gun, what is *certain* is that he knew that Amaral had a gun. A getaway driver or other participant in an *armed* robbery (again, except for an unwitting or coerced one) knows that at least one of his accomplices is armed. Knowledge of the fact that someone is armed does not, however, make the possessor of that knowledge a *major* participant.

Moreover, possessing that knowledge is a passive rather than an active act. There is nothing inherent in knowing that an accomplice is armed that raises the level of participation to that of a major participant. This finding by the Arizona Supreme Court is essentially that Dickens was a *knowing* participant, but that is not the correct standard; *Tison* is a narrow exception that requires *major* participation, not mere knowledge.[1]

Third, the Arizona Supreme Court found that Dickens "drove Amaral to the scene, waited while Amaral committed the robberies, [and] picked up Amaral after the crime." *Id.* at 490. The majority attempts to recast these findings so as to make them more inculpatory to Dickens, by describing those actions as "aiding Amaral's escape," "helping Amaral evade capture," and "help[ing] Amaral flee the scene." Maj. Op. at 8612, 8613. But these are the very functions of participating in a robbery as a getaway driver. These findings, even as recast by the majority, do nothing to distinguish Dickens' actions from those of other getaway drivers. Enmund, who the Supreme Court found could not be sentenced to death, was

---

[1]The majority makes inconsistent representations regarding whether Dickens furnished Amaral with a weapon. At times it states that Dickens was responsible for "arming Amaral with a handgun." Maj. Op. at 8612, 8616. At other times, however, the majority recognizes that Dickens *either* provided the handgun *or* knew Amaral had the handgun, as was stated by the Arizona Supreme Court in the death eligibility section of its opinion. Maj. Op. at 8612, 8617. The reason for its inconsistency is apparent. The Arizona Supreme Court itself makes an inconsistent statement that led to the majority's own inconsistencies. It is, however, the Arizona Supreme Court's former statement, not the latter, that should control our analysis. This is, after all, a death penalty case. To base our decision (even partially) to uphold the execution of a petitioner who did not actively participate in a murder on one of two inconsistent statements by a state court, simply because that one supports the death penalty and the other does not falls far short of fulfilling our obligations to the law and the Constitution. The Arizona Supreme Court expressly did not make a finding one way or the other as to whether Dickens furnished Amaral with a weapon, and it is not for this court to do so.

"in the car by the side of the road at the time of the killings, *waiting to help the robbers escape*." *Enmund*, 458 U.S. at 788 (emphasis added).

Finally, the court found that Dickens "witnessed the destruction of evidence" and "failed to report the crime." *Dickens*, 926 P.2d at 490. These findings are of a passive, rather than active, nature and do not establish that Dickens was a major participant in the underlying robbery. Nor do these findings do anything to distinguish Dickens from other getaway drivers, who may well help dispose of incriminating evidence and do what they can to cover up and prevent others from knowing of their own involvement in the crime.[2]

In sum, in finding that Dickens was a major participant, the court essentially found that he acted as the getaway driver for Amaral, and that he did nothing to stop the robbery before or after it was committed. But, the same could be said about Enmund or any other getaway driver, and the Supreme Court has clearly held that the death penalty is unconstitutional in these circumstances. Moreover, the same could be said about almost any participant in a felony-murder, major or minor. The facts simply do not support a finding that Dickens played

___

[2]The majority again attempts to recast the findings of the Arizona Supreme Court, writing that Dickens participated in "destroying evidence" or "assisted in the destruction of evidence," Maj. Op. at 8612, 8613, rather than merely "witnessed the destruction of evidence." The Arizona Supreme Court never made any finding that Dickens was in any way involved in the destruction of evidence in this case. In describing the facts in the light most favorable to the prosecution, the Arizona Supreme Court wrote: "*Amaral* removed cash, traveler's checks, and one credit card from Bryan's wallet, then burned the wallet and its remaining contents." *Dickens*, 926 P.2d at 475 (emphasis added). This recitation of facts, notably, was "[a]ccording to Amaral's testimony at trial," *id.* at 474, so even under that version of events, it was Amaral, not Dickens, who destroyed the evidence. In any event, even if Dickens had been a participant, rather than a mere witness, in the destruction of evidence, this does nothing to distinguish him from the typical getaway driver, as explained above.

an active and substantial role in the robbery that resulted in the death of the Bernsteins.

There is no basis for comparing Dickens, who helped plan a robbery, knew his accomplice was armed, and drove the getaway car, with the Tison brothers, the exception to the *Enmund* rule on which the majority seeks to rely. The Tison brothers "brought an arsenal of lethal weapons into the Arizona State Prison which [they] then handed over to two convicted murderers," helped them escape from prison, "participated *fully* in the kidnaping and robbery" by flagging down the car on the road, robbing the family, driving the family into the desert, and holding them at gunpoint. *Tison*, 481 U.S. at 139-41, 151-52 (emphasis added). They knew that Gary Tison, their father, was "thinking about" killing the family, and "*saw Greenawalt and their father brutally murder their four captives* with repeated blasts from their shotguns." *Id.* at 140-41 (emphasis added). The Tison brothers played an *active* and *substantial* role in the commission of the crimes (as opposed to its planning), and were therefore major participants; Dickens, whose role was limited to that of getaway driver, was not. This is a crucial and dispositive distinction. The findings by the Arizona Supreme Court in *Dickens* undermine the *Enmund* and *Tison* standard that only *major* participants in the commission of the crime may be eligible for the death penalty, and is therefore an unreasonable application of clearly established Supreme Court law. The lack of any true distinguishing characteristics between Dickens and the typical getaway driver renders the analysis by the Arizona Supreme Court an unreasonable application of *Enmund* and *Tison*.

The majority, no doubt recognizing that the Arizona Supreme Court findings in support of the major participant determination describe nothing more than the typical getaway driver, adds additional findings to support its conclusion that Dickens was a major participant. The majority holds that Dickens was a major participant in the robbery of the Bernsteins because, in addition to the findings by the Arizona

Supreme Court (sometimes as recast by the majority), he "stak[ed] out the crime scene," "target[ed] the victims," "watched Amaral shoot the victims," and "continued in the criminal venture after the murders were committed." Maj. Op. at 8612, 8613-14. Nowhere in its decision does the Arizona Supreme Court take into account these findings in its major participant determination.

Even considering these additional findings, however, the majority does not get far. Three of its additional findings, that Dickens staked out the crime scene, targeted the Bernsteins, and continued in the criminal venture, do little to distinguish Dickens from other getaway drivers who may, for example, scout the neighborhood and identify the mom and pop store to be robbed. Staking out the rest stop area and targeting the Bernsteins for the robbery go only to Dickens' role in planning the robbery, not to any active participation in its commission. And every getaway driver, in some sense, continues in the criminal venture by driving the car away from the scene of the robbery. Doing so is the essence of being a getaway driver. But Dickens did not continue in the criminal venture in the way the Tison brothers did, by continuing to aid escaped murderers and participating in a crime spree, "ending in a gun battle with the police in the final showdown." *See Tison*, 481 U.S. at 151. Dickens drove the car away from the rest stop, and parted ways with Amaral two days later. In fact, Dickens refused to help Amaral use the credit card he had stolen from the Bernsteins. Despite its attempt to conjure up more support, the majority cannot distinguish Dickens from a typical getaway driver, and thus cannot establish that Dickens was a major participant in the underlying crime.

The fourth finding by the majority, that Dickens "watched Amaral shoot the victims," is not only one that the Arizona Supreme Court did not take into account in its major participation determination; it is a finding that the Arizona Supreme Court did not make at all.[3] But rather than "take the facts as

___

[3]The trial court, in its death eligibility determination, made a finding that Dickens "witnessed the shootings." It is well established, however,

the Arizona Supreme Court has given them to us," *Tison*, 481 U.S. at 151, the majority decides to engage in *de novo* fact-finding, and unreasonable factfinding at that, as the finding that Dickens watched the murders is unsupported by the record. Before addressing why the finding is unreasonable, however, it is important to consider why the majority feels compelled to make this finding in the first place. Dickens correctly argues that his case is analogous to *Enmund*, and therefore his death sentence is unconstitutional, because he "was not present when the killing took place." *See Enmund*, 458 U.S. at 795. Like Enmund, he was parked in a car some distance from the scene of the murder, acting as the getaway driver. *See id* at 784, 788. The detectives who examined the crime scene and the surrounding area calculated that it took 2 minutes and 29 seconds to walk from where Dickens was parked to where the murders took place.[4]

---

that "[i]n conducting review of a state court decision, we look to the last reasoned state-court decision." *Lopez v. Ryan*, 630 F.3d 1198, 1202 (9th Cir. 2011) (internal quotation marks and citation omitted). We must therefore look only to the Arizona Supreme Court decision, which did not make this finding. Further, even if we were to consider the trial court decision, the trial court did not make the broad finding the majority makes here that Dickens actually "witnessed Amaral shoot the victims," in the sense that the majority implies. Dickens did, as explained below, witness the shootings in that he heard the gunshot and saw a muzzle flash. But he did not, and the record is clear on this, actually see Amaral shooting the Bernsteins in the head.

[4]The Federal Highway Administration, which establishes the speed for stop lights at crosswalks, sets the standard crossing time at 3.5 feet per second for pedestrian crosswalks. *See* U.S. Department of Transportation, Federal Highway Administration, Manual on Uniform Traffic Control Devices (2009), Ch. 4N, In-Roadway Lights, http://mutcd.fhwa.dot.gov/pdfs/2009/part4.pdf (Dec. 2009). The detectives who measured the distance in this case said they were walking "at a normal walking pace." Assuming a walking speed above that set by the Federal Highway Administration, at 4 feet per second, the average person walks 596 feet, or 199 yards, in 2 minutes and 29 seconds. Enmund was 200 yards away from the scene of the murders, *Enmund*, 458 U.S. at 784, and the Supreme Court held that he was not present at the scene. *Id.* at 795. Neither, therefore, was Dickens.

The majority attempts to refute Dickens' presence argument in two ways. First, the majority holds that "nowhere in *Enmund* or *Tison* does the Supreme Court clearly establish that 'presence' at a murder scene is a mandatory prerequisite for the death penalty." Maj. Op. at 8612. To anyone who has read *Enmund* and *Tison*, however, there can be no question that the Supreme Court established that presence is a critical aspect in the analysis for death eligibility. In both *Enmund* and *Tison*, the Supreme Court stressed on several occasions that Enmund, who was found not death eligible, had not been present at the time of the killings. *See Enmund*, 458 U.S. at 795 (noting that "the defendant . . . was not present when the killing took place"); *Tison*, 481 U.S. at 149 ("At one pole was Enmund himself: the minor actor in an armed robbery, *not on the scene*, who neither intended to kill nor was found to have had any culpable mental state.") (emphasis added); *id.* at 158 (noting that Enmund was "sitting in a car away from the actual scene of the murders"). In surveying states' practices on imposing death sentences on those convicted of felony-murder, the Supreme Court in *Enmund* found that only 16 out of 739 death row inmates in the entire United States were not physically present at the scene of the crime, and only 3 of those inmates (including Enmund) were not physically present and had not "hired or solicited someone else to kill the victim or participated in a scheme designed to kill the victim." *Enmund*, 458 U.S. at 795; *see also Tison*, 481 U.S. at 148 ("The Court [in *Enmund*] found . . . that only 3 of 739 death row inmates had been sentenced to death absent an intent to kill, *physical presence*, or direct participation in the fatal assault . . . .") (emphasis added).

In *Tison*, the Supreme Court *repeatedly* stressed the importance of presence. It noted the finding in *Enmund* that only 3 death row inmates in the entire United States were neither present at the scene nor involved in a scheme to murder. *Id.* at 148. Moreover, the Supreme Court found a consensus among state courts that certain aggravated felony-murders merited the death penalty, as an exception to *Enmund*. *Id.* at

154-55. In describing each of those cases, the Supreme Court specifically noted that the defendants were present at the scenes of the murders, contemplated killing, or used lethal force. *Id.* Moreover, in distinguishing the Tison brothers from Enmund, and justifying the death penalty for the former while not for the latter, the Supreme Court stated:

> Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each [Tison brother] was actively involved in every element of the kidnaping-robbery and was *physically present* during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight.

*Id.* at 158 (emphasis added). Even if presence is not a "mandatory prerequisite" to death eligibility, Maj. Op. at 8612, it is certainly a critical aspect of the inquiry under *Enmund* and *Tison*.

Second, perhaps acknowledging the weakness of its argument that presence is not a critical factor, the majority goes on to hold that "even if *Tison* and *Enmund* could be read to incorporate a mandatory 'presence' requirement, it seems that the Arizona Supreme Court suggested that Dickens met that requirement" because, the majority says, Dickens "watched each part of the Bernsteins' murders as they unfolded." Maj. Op. at 8613-14. According to the majority, "Dickens testified at trial that he. . . (1) watched Amaral leave the truck with a loaded .38-caliber handgun, knowing Amaral was going to rob the Bernsteins at gunpoint; (2) watched Amaral walk across the highway; (3) observed Amaral moving the Bernsteins around the front of their car in the path of the illuminated headlamps; and (4) saw flashes as Amaral shot the victims in the head." Maj. Op. at 8614-15.

The majority overstates the evidence in the record. Dickens testified that after Amaral left his truck, he "lost sight . . .

when he came up to the edge of the interstate" and then "heard one shot and one muzzle flash." Dickens further testified that he saw a "shadow as they went in front of the lights," like "a flicker of light." The prosecution read into the record the following statement by Dickens:

> I remember seeing, I think I seen, I guess it was three, three times I seen somebody pass in front of the lights. I seen the first person, then the second person, and then a few steps behind I seen Travis walk behind or in front of the light.

Moreover, Officer Johnson (the first officer on the scene) testified that it was difficult to see from where Dickens was parked across the highway to the other rest area where Amaral murdered the Bernsteins, in part because there was no lighting in either rest area. In fact, absent the car headlights, it was "pitch black." Amaral also testified at trial that he did not see the moon on the night of the murders,[5] and that there were no street lights that shone into the rest area. This evidence does not support a finding that Dickens actually "watched each part of the Bernsteins' murders as they unfolded." Maj. Op. at 8614. Certainly not, as the majority suggests, in the same way that the Tison brothers watched the victims in that case being murdered. Dickens saw flickers of light, shadows, heard a gunshot, and saw a muzzle flash. The Tison brothers, in contrast, were at the scene of daylight murders and "they *saw* Greenawalt and their father brutally murder their four captives with repeated blasts from their shotguns." *Tison*, 481 U.S. at 141 (emphasis added). In any event, under no fair reading of the evidence can it be said that because Dickens could see part of the shooting of the Bernsteins he was present at the scene of the murders. To the contrary, he like Enmund was sitting in a parked car, approximately the same distance away from the scene as Enmund.

---

[5]The sun set at 6:52 P.M. that night, and the murders occurred around 9:17 P.M.

The majority adds that Dickens was present at the scene of the murders because he "drove through the rest stop to pick Amaral up, and (to use his words)[6] verify "everything had been taken care of" (i.e., verify the victims had been shot)." Maj. Op. at 8614. In reaching this finding, the majority goes beyond overstating the evidence; it completely misconstrues it or adds to it. No state court ever found as a fact that Dickens drove through the rest area. The "facts and procedural history" section of the Arizona Supreme Court decision put the facts in the light most favorable to the state. *Dickens*, 926 P.2d at 474-75. The court began that section with the statement "[a]ccording to Amaral's testimony at trial." *Id.* at 474. It did not, however, adopt some of those statements. For example, the court included "facts," such as the use of the walkie-talkie and other parts of Amaral's "testimony" that it deliberately did not rely on in its discussion of death eligibility under *Enmund* and *Tison*, and that the prosecution itself disavowed during the state proceedings as well as before this court. And yet, even in that "facts and procedural history" section, the Arizona Supreme Court made no mention of Dickens driving through the rest area. Rather, the court said that "[w]hile Amaral was with the Bernsteins, [Dickens] drove across the median *to the westbound lanes*, where he picked up Amaral." *Id.* at 475 (emphasis added). Its major participant and reckless indifference discussion *under* Enmund and *Tison* also did not mention anything about Dickens driving through the rest area.[7]

Only one statement by the Arizona Supreme Court could possibly be interpreted as support for a finding (had one been made) that Dickens drove through the rest area, namely, that Dickens "failed to render aid even though he knew one victim

---

[6]By "his words" the majority means what Amaral testified to at trial about a conversation that he "believe[d]" he had with Dickens. I discuss the unreasonable reliance on this testimony *infra* at pages 8646-47.

[7]Incidentally, neither did the state trial court decision make any mention of Dickens driving through the rest stop.

might not be dead." *Id.* at 490. If we overlook the fact that the Arizona Supreme Court did not specify any factual basis for this finding, and presume that it was making an inferential finding that Dickens drove through the rest stop and as a result of doing so knew that one victim might not be dead, then that finding clearly constitutes an unreasonable finding of fact, as it is unsupported by the evidence in the record. Amaral never stated in his testimony that he saw Dickens drive through the rest area or that Dickens did so. Amaral testified that "the only thing I can remember is he came and picked me up, I don't know if he was leaving the interstate as far as leaving the rest stop or coming [from the interstate] into the lane going out of the rest stop." Even after prompting as to whether he saw Dickens drive through the rest stop, Amaral said he did not remember Dickens driving through the rest stop. At trial, he further testified, "I still don't remember him coming in as I'm going out. There *was not enough time* span where he left the other side to get across when I was running." (emphasis added). Dickens, of course, also denied driving through the rest stop.

The only allegation that Amaral made with respect to this point, on which the majority could conceivably be thought to rely to support its own finding, *see* Maj. Op. at 8620-21 n.13, was a belated half-sentence reference by Amaral to a conversation that Amaral said he had with Dickens sometime after the murders in which he "believe[d]" Dickens said that he went through the rest stop. Neither the Arizona Supreme Court nor the trial court ever mentioned that purported conversation. Neither court deemed the belated statement credible or worthy of mention. In the end, this half-sentence, the only possible "evidence" regarding Dickens driving through the rest stop, is mentioned only by the majority here but not by any state court. Moreover, that "evidence" is contrary to what Amaral himself observed, and contrary to what Amaral testified to regarding the lack of time for Dickens to drive through the rest stop before picking him up on the side of the road. Reliance on the isolated half-sentence about what Amaral

"believe[d]" Dickens had said to support a finding (itself non-existent) that Dickens drove through the rest stop would in any event have been "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In short, there is no basis for any finding that Dickens drove through the rest stop and even more important no finding was made by any state court.

\* \* \*

In sum, the Arizona Supreme Court found that Dickens planned a robbery with Amaral, knew Amaral was armed, acted as the getaway driver, and witnessed the destruction of evidence. That, according to the court, made him a major participant in the robbery of the Bernsteins. It is evident under *Enmund* and *Tison*, however, that these findings are far from sufficient. In reaching a contrary result, the Arizona Supreme Court engages in an unreasonable application of *Enmund* and *Tison*. The record is clear: Dickens, like Enmund, acted as a getaway driver, and "was not present when the killing took place." *Enmund*, 458 U.S. at 795. Instead, like Enmund, Dickens was "sitting in a car away from the actual scene of the murders." *Tison*, 481 U.S. at 158. Dickens' participation in the commission of the crime can be described in the same way the Supreme Court described the participation of the defendant in *Enmund*: he was a "minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." *Id.* at 149. Although Dickens helped plan the robbery, like Enmund, he was not a major participant in the commission of the crime itself. "Putting [him] to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts." *Enmund*, 458 U.S. at 801. Nor does it serve any deterrent purpose. *Id.* at 798-99. The Arizona Supreme Court decision to the contrary "involved an unreasonable application of[ ] clearly established

Federal law, as determined by the Supreme Court of the United States*." See* 28 U.S.C. § 2254(d).

In short, Dickens clearly does not meet the major participant requirement necessary for a determination of death eligibility under *Enmund/Tison*. The Arizona Supreme Court's contrary ruling is an unreasonable application of established Supreme Court law.

## III. Reckless Indifference

Even if Dickens were a major participant in the underlying robbery, the evidence does not support a finding that he satisfied the second requisite element necessary to make him death eligible: reckless indifference to human life. In *Tison*, the Supreme Court established a standard for reckless indifference to the value of human life that was not quite intent to kill, but was more than mere foreseeability: reckless indifference means "knowingly engaging in criminal activities known to carry a grave risk of death." *Tison*, 481 U.S. at 157. The Supreme Court gave some examples of those who exhibit "reckless indifference to the value of human life": individuals it described as "among the most dangerous and inhumane of all" murderers. *Id.* They include "the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim." *Id.* Dickens, the getaway driver in a robbery, clearly is not "among the most dangerous or inhumane of all" murderers.

Here, the Arizona Supreme Court found that Dickens acted with reckless indifference to human life because, in addition to the fact that he was a major participant, he "had considerable experience with the justice system through his other felony convictions, was aware that Amaral had a violent and explosive temper, and failed to render aid knowing that one victim might not be dead." *Dickens*, 926 P.2d at 490. The

majority concludes that, given these facts as determined by the Arizona Supreme Court, the "conclusion that Dickens exhibited a reckless indifference to human life was not objectively unreasonable." Maj. Op. at 8616. Here, too, the majority is clearly wrong. The Arizona Supreme Court conclusion constitutes an unreasonable application of established Supreme Court law and is based on an unreasonable determination of the facts.

The majority first erroneously rejects the argument that armed robbery is not a crime known to carry a great risk of death, as the Supreme Court required for a finding of reckless indifference. *See Tison*, 481 U.S. at 157. In *Tison*, the Supreme Court noted that there are some crimes for which "any major participant necessarily exhibits reckless indifference to the value of human life." *Id.* at 158 n.12. The Supreme Court expressly did not include armed robbery in that class of crimes, however. Instead, it remanded for the state courts to determine whether the Tison brothers, convicted of armed robbery *and* kidnapping, had acted with reckless indifference. *Id.* at 156-58. In *Enmund*, moreover, the Supreme Court held that its analysis of whether Enmund acted with a sufficiently culpable mental state would be very different "if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony." *Enmund*, 458 U.S. at 799. The Supreme Court held that the kind of crime that Enmund (and Dickens) committed — armed robbery — was not one in which "death so frequently occurs." *Id.* at 799-800. It cited the Uniform Crime Report to note that "only about 0.43% of robberies in the United States in 1980 resulted in homicide." *Id.* at 800 n.24. Looking at that same data source, in 2010, the last year for which full statistics are available, there were 367,832 robberies, and 780 murders in connections with robberies.[8] Thus, the number of murders in connection with rob-

---

[8]See Uniform Crime Report, 2010, Crime in the United States, tbl. 1, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-

beries as a percentage of total robberies has actually been cut
in half since *Enmund* was decided, from 0.43% to 0.21%. In
holding that "Dickens failed to cite any U.S. Supreme Court
precedent, and we know of none, clearly establishing" the
principle that armed robbery is not the type of crime "known
to carry a grave risk of death," Maj. Op. at 8616, the majority
simply fails to honor the analysis in *Tison* and *Enmund*. The
clear import of those cases is that mere participation in an
armed robbery is not enough to establish that a defendant
acted with reckless indifference to human life.

Still, the question remains whether under the facts of this
case, as determined by the Arizona Supreme Court, a finding
that Dickens acted with reckless indifference to human life is
reasonable. The answer is, without doubt, no. First, the Ari-
zona Supreme Court found that Dickens had "considerable
experience with the justice system through his other felony
convictions." *Dickens*, 926 P.2d at 490. Notably, the majority
fails to discuss how this fact supports a finding of acting with
reckless indifference. It was wise to do so, because convic-
tions for forgery and lewd and lascivious acts with a child
under 14 years of age, the crimes for which Dickens had been
convicted, do nothing to establish that he "knowingly engag-
[ed] in criminal activities known to carry a grave risk of
death." *Tison*, 481 U.S. at 157.

Second, the Arizona Supreme Court found that Dickens
was "aware that Amaral had a violent and explosive temper."
*Dickens*, 926 P.2d at 490. The majority relies heavily on this
"fact" in its reckless indifference analysis, ultimately conclud-
ing that "Dickens 'could have foreseen that lethal force might
be used' in the course of the robbery." Maj. Op. at 8617
(quoting *Tison*, 481 U.S. at 151-52). The Supreme Court held

u.s.-2010/tables/10tbl01.xls (last visited Jan. 11, 2012); Expanded Homi-
cide Data, tbl. 12, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/
2010/crime-in-the-u.s.-2010/tables/10shrtbl12.xls (last visited Jan. 11,
2012).

in *Tison*, however, that foreseeability could not be the test for reckless indifference. In fact, the Supreme Court noted that "[p]articipants in violent felonies like armed robberies can frequently *anticipate* that lethal force might be used in accomplishing the underlying felony." *Tison*, 481 U.S. at 150-51 (emphasis added) (internal quotation marks, alterations and ellipses omitted). "Enmund himself may well have so anticipated." *Id.* at 151. "[T]he possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen." *Id.* If foreseeability were the test for death penalty eligibility, then that test would be reduced to "little more than a restatement of the felony-murder rule itself." *Id.* Thus, the holding by the majority that Dickens could foresee the use of lethal force is insufficient and cannot support the proposition for which it is advanced.

Finally, the Arizona Supreme Court found that Dickens "failed to render aid even though he knew one victim might not be dead." *Dickens*, 926 P.2d at 490. First, for the reasons stated in the previous section of this dissent, if the Arizona Supreme Court was making an inferential finding *sub silentio* that Dickens drove through the rest stop and as a result of doing so affirmatively knew that one victim might not be dead, then the evidence in the record simply does not support such a finding. Of course, if Dickens did not drive through the rest area, then there is no factual basis whatsoever in the record to support a finding that he *knew* that one victim might be alive. Without any facts to support a finding, and the only facts in the record being to the contrary, the finding that Dickens *knew* that one victim might still be alive and that he was recklessly indifferent in failing to stop and render aid is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[9]

---

[9]Apparently recognizing that the finding by the Arizona Supreme Court that Dickens knew Bryan Bernstein might still be alive is indefensible, the

Next, as the state in effect conceded at oral argument, the simple *failure* to go through the rest stop and check the victims to make sure they were not alive would not constitute reckless indifference. Otherwise, any getaway driver would be recklessly indifferent if he fulfilled his role and drove away from the scene of the crime without first checking to determine whether all possible victims of a shooting in the course of a robbery were dead. It is clear that getaway drivers are not per se death eligible because Enmund was not death eligible, and the *Tison* Court repeatedly made clear that the death eligibility rules are not merely restatements of the felony-murder rule. *Tison*, 481 U.S. at 151.

There is simply no factual support whatsoever for any finding that Dickens drove through the rest area to see that both victims were dead and then drove on, leaving a still living victim, *knowing* that the victim might still be alive. Nor, of course, according to the record, was there any other reason Dickens might have driven through the rest stop while helping Amaral make his escape. And even if we overlooked all the contrary facts and nevertheless concluded that Dickens did drive through the rest stop in order to see that the victims

---

majority instead holds that "the Arizona Supreme Court did not '*base*' its decision" on that finding and that it was "not a dispositive factor in th[e] determination" that Dickens was recklessly indifferent. Maj. Op. at 8620-21 (emphasis added). It does so by deciding, without explanation, that the critical factor was *not* that Dickens knew that one victim might be alive, but rather that he "watched Amaral shoot the Bernsteins, but decided to aid Amaral over the Bernsteins." Maj. Op. at 8620. The majority is clearly wrong. The Arizona Supreme Court did not find that Dickens was recklessly indifferent because he "failed to render aid" to the Bernsteins and instead aided Amaral. *See Dickens*, 926 P.2d at 490. In fact, the Arizona Supreme Court did not mention Dickens' decision to aid Amaral *at all* in its reckless indifference discussion. Instead, the Arizona Supreme Court made an explicit finding, albeit an unreasonable one, that Dickens failed to aid the Bernsteins *knowing* that one victim might be alive. *See id.* It clearly relied on that finding to determine *beyond a reasonable doubt* that Dickens acted with reckless indifference to human life.

were dead, then it is illogical, irrational and unreasonable to say that he knew one victim might be alive and drove on, leaving the victim in a seriously wounded state. If Dickens took the time to drive through the rest stop right after the murders to make certain both victims were dead, and he thought that one of the victims was still living, in that unlikely instance, he most certainly would have done something to ensure that the living victim failed to survive rather than driving on satisfied with the knowledge that one victim might still be alive. Thus, even considering the state's whole range of factually unsupported possibilities, the only reasonable conclusion is that Dickens drove off without entering the rest stop area or without knowing the fate of the victims or at most drove off believing that both were dead, not that one victim might still be alive. Accordingly, the wholly factually unsupported rest stop drive through theory cannot support the conclusion that Dickens' conduct demonstrated reckless indifference to human life.[10]

In addition to the findings by the Arizona Supreme Court in connection with the reckless indifference determination, the majority improperly relies on the findings of the state trial court to support its conclusion that Dickens acted with reckless indifference to human life, including findings that Amaral had beaten up a nurse, had a long history of carrying guns, twice threatened Dickens by pointing the gun at his head, and bragged about being involved in other murders. Maj. Op. at 8616-17. Nowhere does the Arizona Supreme Court refer to

---

[10]There is no other suggestion in the record that Dickens somehow became aware of the physical condition of either of the Bernsteins. Nor do I read the Arizona Supreme Court decision as holding that a getaway driver who does not abandon his assignment to help the perpetrator or perpetrators of a robbery flee the scene so that he may determine the physical state of the victim or victims of a shooting that occurs during an armed robbery, and provide medical aid when desirable to the victims, has demonstrated reckless indifference to human life such that he has become one of the "most dangerous and inhumane of all" murderers. Such would be a remarkable ruling indeed.

any of these findings, including in its reckless indifference determination. And, as I noted above, it is well established that "we look to the last reasoned state-court decision." *Lopez*, 630 F.3d at 1202 (internal quotation marks and citation omitted). Even if the Arizona Supreme Court had adopted those findings, they would not support the conclusion that Dickens knew that there was "a *grave risk* of death" or that the "natural" result of the robbery would be the death of the Bernsteins. *Tison*, 481 U.S. at 157-58 (emphasis added). Anger control problems in no way indicate that an individual will engage in murder. Nor does having beaten someone up on one occasion suggest that the individual will commit a murder. Carrying a gun, which is a Second Amendment right, also cannot legally lead to a finding that the individual is likely to murder someone; if it could, half or even more of the people in some of our states would qualify as likely murderers. While the trial court noted that Amaral had bragged to Dickens about committing other murders, it did not find that Dickens believed this statement, and it is clear that, as Dickens testified, he didn't. In fact, as Dickens testified, when Amaral was first brought to Oak Grove Dickens was told that Amaral was a "chronic liar" with some "wild stories." The trial court also noted that Amaral had scared Dickens by pointing a gun at him "*a day or two prior* to the murders." (emphasis added). Pointing a gun and not shooting someone is a far cry from being a likely murderer. Even if these additional facts did suggest that Dickens could anticipate or foresee the possibility of violence, they do not suggest that Dickens knowingly engaged in criminal activity known to carry a grave risk of death. As noted above, the Supreme Court has rejected foreseeability as the test for reckless indifference because such test would amount to "little more than a restatement of the felony-murder rule itself." *Tison*, 481 U.S. at 151.

\* \* \*

In sum, the Arizona Supreme Court found that Dickens acted with reckless indifference to human life because he was

a major participant in the robbery of the Bernsteins, had prior felony convictions for forgery and lewd and lascivious acts with a child under 14 years of age, knew that Amaral had a violent and explosive temper, and "failed to render aid knowing that one victim might not be dead." *Dickens*, 926 P.2d at 490. These findings, as I have explained above, "involved an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States" in *Enmund* and *Tison*, *and* are "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d).

The Supreme Court made clear in *Tison* that the reckless indifference standard helps to "definitively distinguish[ ] the most culpable and dangerous of murderers." *Id.* at 157. Dickens is certainly neither. Even given the gruesome facts in *Tison*, the Supreme Court did not find that the brothers had been recklessly indifferent. Rather, it sent the case back to the state courts to make that determination, and the Tison brothers ultimately received life sentences. Dickens did not act with the "highly culpable mental state" required to establish death eligibility under *Enmund* and *Tison*, *see id* at 157-58, and certainly not because the individual with whom he planned the armed robbery was a young man who he knew had an anger problem.

## IV. Conclusion

For the reasons set out above, the Arizona Supreme Court determination that Dickens was a major participant in the robbery of the Bernsteins and acted with reckless indifference to human life "involved an unreasonable application" of the Supreme Court decisions in *Enmund* and *Tison*, and "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Dickens was the getaway driver to an armed robbery, did not play an "active" and "substantial" role in the commission of the underlying crime, *see Kennedy*, 554

U.S. at 421, and was not present at the scene when Amaral shot the Bernsteins. Nor did Dickens "knowingly engag[e] in criminal activities known to carry a grave risk of death" simply because he was a participant in an armed robbery. *Tison*, 481 U.S. at 157. The majority reaches the contrary result only by misconstruing the record and engaging in improper and unreasonable factfinding. It is clear, however, that Dickens is not one of the "most culpable and dangerous of murderers" such that he should be put to death by the State of Arizona.

Because the Arizona Supreme Court's decision that Dickens was a major participant in the armed robbery and that he acted with reckless indifference constitutes an unreasonable application of established Supreme Court law and is based on an unreasonable determination of the facts in the record, I dissent from the denial of the writ.[11]

---

[11]Because I would grant habeas relief on the *Enmund* and *Tison* claim, I would not reach any of the other issues the majority decides in the opinion or in the accompanying memorandum disposition that relate to the imposition of the death penalty.